THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT ALLEN VOTAVA, Defendant-Appellant.

Fifth District   No. 5—90—0015

Opinion filed December 27, 1991.

Clyde L. Kuehn, of Kuehn & Trentman, of Belleville, for appellant.

William Haine, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

Defendant, Robert Allen Votava, appeals from his convictions and sentences on two counts of criminal sexual assault against his daughter. In the first count of the criminal information, the defendant was charged with sexual penetration of the victim, who was under 16 years of age, in that he placed his penis in her mouth in June 1988, in violation of section 12—13(a)(3) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(3)). In the second count, the defendant was charged with having sexual intercourse with the victim in May 1988, again in violation of section 12—13(a)(3) of the Code. Following a jury trial, the defendant was found guilty of both counts, and the court subsequently sentenced the defendant to 15 years' incarceration on each count to run consecutively.

On appeal, the defendant contends (1) that his due process rights were violated as the prosecutor knowingly allowed false testimony to stand uncorrected, (2) that the court erred in refusing to disclose the victim's psychiatric records to the defendant, (3) that the court erred in denying his motion for a continuance during the trial, (4) that the court erred in allowing an expert witness' opinion testimony, (5) that cumulative prosecutorial misconduct deprived the defendant of a fair

trial, and (6) that the defendant's sentences were excessive. Before considering these issues, a statement of the facts is necessary.

Carolyn Warnecke (Warnecke) testified that she lived across the street from the defendant and the victim. The victim began babysitting for her when the victim was 11 years of age. Warnecke noticed that the victim began to have mood swings and that the victim always seemed to know when she and her husband came home at night, even though she worked nights and often came home late, sometimes at 2 a.m. or 4 a.m.

Warnecke stated that the defendant was not often at home and that he usually came home around midnight or 1 a.m. She knew that the defendant was at the taverns. Warnecke knew that the victim had a lot of anger towards the defendant, and Warnecke had thought this was because the defendant did not attend the victim's basketball and softball games.

On the evening of the town's homecoming in July 1988, Warnecke saw the victim early in the evening. After midnight, Warnecke's sister-in-law came and got her and told Warnecke that the victim needed her, as the victim had just had a fight with the defendant. When Warnecke arrived, the victim was bruised and upset, so Warnecke took her for a walk. Warnecke and the victim sat down, and Warnecke held the victim while she cried. The victim told Warnecke about the fight between her and the defendant, and then the victim told Warnecke that the defendant would take her out in his truck and sexually molest her. Warnecke asked the victim if she understood what she was accusing the defendant of, and the victim acknowledged that she did.

Warnecke took the victim back to her house and settled her down. Subsequently, Warnecke went to the victim's house and told the victim's mother about the victim's accusations against the defendant. Warnecke asked that the victim be allowed to stay with her until it was determined what was to be done about this problem, and the victim's mother agreed.

The victim stayed with Warnecke approximately six weeks. During this time, the victim exhibited unusual sleep habits; for example, the victim would not go to sleep until everyone else had gone to bed. On one Sunday afternoon, the victim was exhausted and she fell asleep on the couch while Warnecke was present. In her sleep, the victim started fighting and shoving and saying "stop, stop." Warnecke awoke the victim and calmed her down. The victim fell back asleep, and her struggling in her sleep resumed.

Because Warnecke was concerned about the victim, she told a friend about her and wondered what she should do. The friend gave her the name of Andy Stratman, a "survivor," *i.e.*, a person who had dealt with this type of situation. Warnecke gave the victim's mother Stratman's name, and the victim's mother called Stratman.

On cross-examination, Warnecke testified that the defendant was highly critical of the victim. She admitted the victim was upset with the defendant because he did not spend much time with her. Warnecke also admitted that the fight on the night of the homecoming between defendant and the victim was triggered because of the victim's drinking. It was her understanding that on that night, both the victim and the defendant were drunk, and that the defendant had questioned the victim about her drinking and coming home late. Warnecke admitted being concerned about the victim's drinking.

Warnecke told of having seen bruises on the victim's face and hands on other occasions prior to the fight. Warnecke explained that the victim's explanations of her bruises did not always coincide with her injuries. However, Warnecke knew that the victim had a lot of anger and that, when the victim became angry, her release was to strike something. Warnecke stated that much of the victim's anger was directed at the defendant.

Andrea Stratman testified that because of her background as a sexually abused person, a doctor in Springfield had asked her to be a sexual assault perpetrator's advocate, *i.e.*, she met with convicted perpetrators of sexual abuse and told them what a victim of sexual assault goes through. Similarly, she has spoken to law enforcement groups and people in intervention positions to explain to them a sexual assault victim's reactions.

At the end of July 1988, Stratman received a call from the victim's mother. As a result, Stratman saw the victim on August 1, 1988. At that time, the victim was 15 years of age, and she and the victim talked privately at Stratman's home. She has seen the victim on numerous occasions since that time.

From Stratman's observations of the victim, she found that the victim is very fearful, and that the victim finds it difficult to trust. On occasion, when the victim had stayed overnight at Stratman's home, she noticed that the victim had unusual sleep patterns. Stratman stated that if the victim tried to sleep, she awakened quickly after falling asleep. Also, the victim's sleep was fitful; at times, she called out in her sleep in fear; and she made motions to defend herself and sounds which sounded like coughing sounds. When the victim awoke,

she told Stratman that the defendant was forcing her to have oral sex.

Stratman testified that she has not seen the victim react violently, but the victim has verbally expressed her anger to Stratman. Also, the victim has talked to Stratman about suicide.

On cross-examination, Stratman admitted that she has no formal training in psychology or social work. However, she stated she would not accuse an innocent man of sexual abuse. Stratman further testified that she had never seen the victim intoxicated, but she was aware that the victim had a beer once in a while. On occasion, the victim has called Stratman to come and get her when the victim became involved in a serious alcohol situation.

The victim's mother testified that she had been married to the defendant for 20 years, and that they have two daughters, one of whom was the victim in this case. She is currently separated from the defendant, but she continues to see him once a week. In 1988, the defendant worked every day and sometimes on weekends. The defendant would leave for work at 6 a.m., and he would possibly get off work at 4 p.m. However, the defendant did not come home until later, usually between 10 p.m. and 11 p.m., as the defendant stopped at the taverns to visit with his friends after he left work. When the defendant came home at night, he had alcohol on his breath and he sometimes had slurred speech and bloodshot eyes. After the defendant arrived home, he ate and then went to bed, but upon occasion, the defendant took the victim out in his truck after he came home. The defendant was drunk when he did this. According to the witness, the defendant told her he was taking the victim for a ride to talk to her. She explained that she was having problems with the victim, and she told the defendant of her concerns, and she asked the defendant to talk to the victim about it. The witness disliked this practice, but she did not know if she voiced her disagreement to the defendant.

The victim's mother was only able to remember the defendant taking the victim for truck rides in the last couple of years. Although she recalled the defendant taking the victim on truck rides on only two or three occasions, she admitted that the truck rides may have occurred more often than she was aware as she is a sound sleeper. She recalled that on one occasion in 1988 when the defendant took the victim out in his truck, it was storming outside. She was unaware as to how long the defendant and the victim's rides were, as she was often asleep when they returned. The witness admitted that she did not think that the victim liked to go on the truck rides, but she did not recall the victim objecting to going on the rides. The victim's

mother also testified that the victim always had bruises on her, but the victim was athletic and played ball so she did not find this unusual.

On cross-examination, the witness admitted that she never confronted the defendant with the victim's accusations. She testified that on the night of homecoming, she, the defendant and her nephew had gone to the homecoming events. The victim had gone out with her friends, as had her sister. That evening, the witness arrived home before the defendant, and the victim arrived home shortly after the defendant.

When the victim came home, she was intoxicated. The witness stated that she had never seen the victim like that before. The victim and the defendant were in the kitchen, and the defendant was angry because the victim had come home past her curfew. The defendant and the victim started yelling at each other. The victim shouted that she wished she were dead and that the defendant were dead. The defendant struck the victim in the face, after which the defendant and the victim physically fought each other for 15 or 20 minutes. The witness attempted unsuccessfully to break them apart. The defendant held the victim while he hit her, as he was "a lot bigger and stronger" than the victim. After their fight, the victim accused the defendant of his sexual misconduct; however, the witness was not told of the victim's accusations by the victim.

The victim's mother testified that the victim and her sister shared a bedroom. The bedrooms were upstairs in the house, and when upstairs, you are unable to hear anyone talking in the living room and dining room downstairs. The witness was aware that the victim was unable to sleep well, and she is now aware that the victim has fitful dreams. The victim's mother admitted that the victim has lied to her on occasion, but that the victim has never lied about something like this, and that usually the victim is a truthful person. According to the witness, the defendant never took the victim's sister for truck rides.

The victim's sister's testimony about the victim and the defendant's fight on the night of homecoming in July 1988 was substantially similar to her mother's testimony. After the fight, the victim was bleeding from the mouth and she had a black eye.

The victim's sister stated she shared a bedroom with the victim. She was unaware when the defendant came home at night as she was usually asleep and she is a sound sleeper. On occasion, she has awakened at night and not found the victim in their bedroom.

The victim's sister was aware that the defendant had taken the victim out for truck rides on one or two occasions. On one of those

times, it was after midnight, and the defendant was mad because the dog had not been fed. She knew the victim did not like to go on the truck rides, because once when she was upset, the victim said to her "that at least I [the victim's sister] didn't have to go for rides in the truck."

According to the victim's sister, the victim became quiet and withdrawn in grade school, and as the victim got older, she did not like to be at home. The victim sometimes went fishing with the defendant, but she did not like to go alone with him. The victim never told her that she and the defendant had a sexual relationship.

On cross-examination, the victim's sister stated that the victim is a loner just like the defendant. She thought the victim resented that the defendant did not attend the victim's sports events. She admitted that she and the victim are not close. She was aware that the victim gets angry because her mother continues to see the defendant.

The victim's sister did not believe that the victim has a drinking problem; however, she believes the defendant is an alcoholic. On the night of homecoming was the first time she had seen the victim drunk.

The victim testified that the defendant is her father. She is presently 16 years of age. She stated that the defendant's sexual abuse of her began when she was about 11 years old. The first time that the defendant sexually abused her, the defendant started yelling at her at home. The defendant then asked the victim's mother if he could take the victim for a ride as he needed to talk to her. This transpired a little after midnight. The victim's mother told her it would be all right and that she should go with the defendant. The defendant took her out into the country about two or three miles and stopped the truck. The defendant started touching her breasts and vagina through her clothes. This activity lasted about an hour and a half. The defendant's conduct scared her, and the victim did not know why this was happening. About a month later, the defendant took her out in the truck again, but this time, the defendant had her take her shirt off. He again fondled her. These activities continued and eventually, the defendant started having the victim have oral sex with him. Ultimately, the defendant had sexual intercourse with her. The defendant told her that if she told anyone about these activities, he would do the same things to the victim's mother, her sister, and other people she cared about. The victim did not tell anyone because she was frightened. The defendant's activities usually occurred late at night after the defendant had been drinking.

When the victim turned 12 or 13, she began to think that the defendant's activities were not normal. She began to have sleeping difficulties at this time. When she was unable to sleep, she would listen to the radio, and when this did not help, she would go downstairs and watch the neighbors from the window. She wondered what was happening to the neighbors' children.

The victim explained that she did not tell anyone about the defendant's activities as she got older because she did not know what people would think, and she did not want anyone else to get hurt. The victim recalled one night when the defendant took her out in the truck to a cemetery when it was storming outside. The victim resisted the defendant and fought him, whereupon he tied her spread-eagle to some trees. The defendant had intercourse with her while she was tied up, then he left her still tied to the trees. The defendant returned for her a half hour or an hour later.

The victim testified that in May 1988, the defendant again took her to the cemetery, tied her up to some trees and had intercourse with her. In June 1988, the defendant took her to the bridge at Marine/St. Jacob Road, and he accused the victim of being a lesbian. The victim refused the defendant's advances, and the defendant hit her in the stomach and her head. The defendant then forced her to have oral sex with him. The victim stated that she did not enjoy these activities, and the defendant told her these things were supposed to make them both feel good. The victim testified that she felt dirty and guilty, and she did not want to live. She stated she was "mad" that the defendant was sexually molesting her. She also admitted that she was angry with the defendant because of his drinking and his not being part of the family. She further testified that her mother never tried to protect her from the truck rides.

The victim admitted that she began drinking in the fourth grade with her friend Linda Porter. It tasted terrible the first time, but they continued to drink because they wanted to know why their fathers drank so much of it.

The victim also testified to the events on the evening of homecoming in July 1988. She admitted she had had about eight beers that evening, and that the defendant was home when she came home that night. The defendant yelled at her, and she yelled back at him. Next, the defendant hit her in the head and stomach, and she struck the defendant back. She and the defendant fought until other persons pulled them apart. She stated that she tried to hit the defendant again because she was angry with the defendant because of "[s]ex, be-

ing fed up, the way I was feeling. I was tired of the way I was feeling." She stated she felt upset, angry, guilty and dirty.

The victim corroborated that Carolyn Warnecke came to her after the fight, that they went for a walk and sat down, and that she started crying. The victim told Warnecke that her father had been sexually abusing her. The victim did not tell Warnecke any details as she was ashamed and embarrassed.

The victim also stated that she went to see Andrea Stratman, and that she talked to Susan Redman from the Department of Children and Family Services (DCFS).

On cross-examination, the victim admitted that she drinks sometimes with her friends, who are about four years older than her. The victim admitted that the defendant was harsher with her than her sister. She further admitted that she had had psychiatric treatment and was in the hospital three months at Deaconess Hospital in St. Louis, because the counselors and doctor thought she did not want to live. She stated that, at that time, that was how she felt. The victim also stated she has had counseling.

The victim admitted being angry with her mother for continuing to see the defendant. The victim estimated that the defendant sexually molested her between 30 to 50 times over a period of four or five years. When asked how the defendant managed to tie her up with one hand, the victim could not explain how the defendant was able to do this.

Penny Gozia testified that she is an obstetrician and gynecologist. She saw the victim on September 1, 1988. She found the victim uncommunicative. She testified that, on the basis of her physical examination of the victim, the victim had been sexually active. The doctor's examination did not reveal any evidence of forced sexual activity, but it was the doctor's opinion that the victim had had intercourse more than once.

Carol Corgiat (Corgiat) testified that she was employed as a psychologist on a part-time basis by Cardinal Glennon Hospital for Children and worked part time for a private psychiatrist, Dr. Jatalya. She stated that her educational background consisted of a bachelor's degree in psychology, a master's degree in psychology and a nine-month internship in the schools to obtain her certification as a school psychologist. In her work as a psychologist, Corgiat had counseled sexually abused patients for seven or eight years. The court qualified Corgiat as an expert witness.

In Corgiat's work as a counselor, she treats the issues caused by the trauma of sexual abuse. Some of the symptoms of sexual abuse

are low self-esteem, chronic depression, some suicidal ideations, acting-out behavior in young children, substance abuse, sleep disturbance, anger, and blocking out of feelings. These symptoms are referred to as rape-trauma syndrome and describe the process sexually abused persons go through.

Corgiat first saw the victim in December 1988, and she has continued to see her weekly since that time. Her treatment with the victim has been primarily to build a rapport with her, as the victim "has a wall built up" and she does not relate very well. She described the victim's behavior as depressed and anxious. She found that the victim's behavior "very much matches with characteristics" of rape-trauma syndrome. Corgiat stated that typically a sexually abused person discloses her experiences in bits and pieces with the least traumatic experiences revealed first. Corgiat explained that the reason for this is to test the reactions of the persons around them. In her opinion, it would be difficult for the victim to "fake" the symptoms that the victim had exhibited.

On cross-examination, Corgiat admitted that she was aware that the victim had been hospitalized in a psychiatric ward for three months. Corgiat admitted that she did not do any standardized testing of the victim, as the report from the hospital stated that they did a diagnostic work-up of the victim and she felt it was unnecessary. Corgiat was unable to recall what the hospital's diagnostic-test results of the victim were, although she did receive them. Corgiat testified that the victim had told her some of the things that had happened to her, but she had not given her many details. The victim had told Corgiat that the defendant was verbally abusive, *i.e.*, he yelled at her and made derogatory statements about her. Corgiat had no reason to disbelieve the victim. Corgiat admitted that she has had a patient manipulate her before, but on redirect examination, Corgiat stated that the victim has not manipulated her with regard to whether the sexual abuse happened or not.

Corgiat testified that she and the victim have discussed the victim's drinking. Corgiat was aware that the victim started drinking in fifth or sixth grade.

Corgiat was asked by defense counsel to define the term "sociopath," which she did. On cross-examination, Corgiat was asked if she had conducted any tests to determine if the victim was a sociopath, to which Corgiat responded that she had not conducted any tests on the victim. In Corgiat's notes, a psychiatrist had reported that the victim may be overreporting her somatic (physical) complaints, and that there is "future suggestive post-traumatic stress as well as possibly

even dissociative phenomenon." Corgiat explained that "dissociative phenomenon" occurs, for example, when children describe sexual abuse and say that it felt like "they kind of went somewhere else while that was happening to them." Corgiat stated that dissociation is symptomatic of sexual abuse cases. When asked if this is a symptom of schizophrenia, Corgiat stated that a schizophrenic is out of touch with reality. Corgiat based her conclusions about the victim upon her observations of the victim and upon the information the victim had told her.

Susan Redman Ostendorf testified that she had worked for DCFS for almost 10 years. On August 15, 1988, she interviewed the defendant in Detective Huebener's office in Detective Huebener's presence. Ostendorf advised the defendant of the victim's accusations, but the defendant denied he sexually abused her. The defendant admitted that he took the victim for truck rides for the purpose of getting closer to his daughter. The defendant stated that he also did not want his other daughter to hear what he had to say to the victim. According to the defendant, the truck rides were his wife's idea. The defendant also admitted that he stopped after work for six to eight beers. The defendant admitted that he and the victim had a fight on the night of homecoming.

John McCarey testified on the defendant's behalf. He testified that he is a trooper for the Illinois State Police, and that he has known the defendant for 19 years. McCarey stated that he was familiar with the area described by the victim as to where the assaults took place. To his knowledge, no one had ever reported seeing the defendant's vehicle stopped in those areas. He stated that there is a timbered area in the cemetery where a person may not be readily discovered, depending on the time of night or early morning.

McCarey testified that he is aware of the defendant's reputation in the community, and to his knowledge, the defendant has a "normal reputation." The defendant gets along with people in the community. He believes the defendant has good morals and a good character.

On cross-examination, McCarey admitted that he knew the defendant drank every day, but he did not think the defendant had a drinking problem. McCarey was unaware of any civic activities that the defendant participated in, but he knew that the defendant was on the city council at one time.

Glenn Burnett testified that he had known the defendant since early 1976. In his opinion, the defendant's reputation is "fine," and he would trust his life with the defendant. He also believes the defendant is honest. He stated that the defendant is not a womanizer.

Burnett stated that the victim went fishing with the defendant and Burnett five or six years ago. On that trip, the defendant had no untoward conversation with the victim, and there was no indication of sexual behavior on the defendant's part towards the victim.

Burnett never knew that the defendant had a drinking problem. He knew that the defendant drank beer, just as he does. Burnett stated he drank beer five days a week, but that four beers are his limit.

Harold Rehg, Jr., testified that he had been a friend of the defendant's for 15 years. He thought the defendant's reputation in the community was good. He admitted on cross-examination that he had heard that the defendant may have an alcohol problem. He had also heard that the defendant hit his daughter, which he did not think was right.

Ardell Bline testified that he worked with the defendant. He described the defendant as a diligent, hard worker. He thought that the defendant has strong morals. He stated that if sexual remarks or off-color remarks were made at work, the defendant called those persons "sickies." On cross-examination, Bline admitted that he did not know how much the defendant drank. He did not think a person should get drunk and hit a child in the face.

The defendant testified that he has worked at Granite City Steel for almost 22 years. In 1988, the defendant worked from 6 or 7 a.m. to 6 or 7 p.m. and every other Saturday and all of the holidays, except for Christmas Day and Labor Day. In the late 1970's, the defendant served on the town board for four years. He also helped at the church picnic at the church across the street from his home. He admitted that he drank. The defendant thought that he was a good father as he provided a good home, food and clothes for the family. The defendant corroborated that he did not spend much time at home. According to the defendant, he usually got home anywhere between 9 and 11 p.m.

The defendant stated he and his wife got along well. He also stated he and his daughters got along until they became teenagers, and then he had difficulty communicating with them. He described the victim as independent, and he said she would "sass" her mother.

The defendant testified that he was the disciplinarian in the family. When the victim required discipline, he tried to talk to her, but he sometimes used "harsh talk." He recalled that after the victim's first year in high school, the school counselor, Theresa Oakley, made an appointment with the defendant, his wife and the victim. The school counselor was concerned about the victim's state of mind. The school

counselor advised the defendant that the victim told her she did not have any friends, that she did not like playing sports any more, and that the victim blamed this on the defendant and his drinking. The defendant denied telling Oakley that he had a drinking problem. Oakley suggested that they obtain family counseling and he agreed; however, this never came about.

At the meeting with Oakley, the defendant was informed that the victim thought that he did not spend much time with her and her sister because he wanted boys instead of girls. The defendant admitted that he took the victim for a truck ride to talk to her about this. He further admitted that he took the victim on truck rides six or eight times over a three- to four-year period. These rides occurred when he got home at night, maybe at 11 p.m., and the rides lasted 45 minutes to an hour. The defendant knew his wife disapproved of the defendant taking the victim out after he had been drinking, but the defendant did it anyway. According to the defendant, he took the victim for truck rides in order to talk to her without his wife's interference. On these rides, the defendant discussed such things as the victim's feelings of suicide, the victim's possible gay tendencies, and her grades. The defendant further admitted he took the victim out in the truck one night when it was storming outside. The defendant denied he stopped the truck during these rides.

The defendant admitted that he fought with the victim on the night of homecoming. The defendant stated that the victim came home that night after midnight. When the defendant asked the victim where she had been, the victim screamed obscenities at him and that she wished both he and she were dead. He warned the victim that if she did not stop using foul language he would "smack" her. When the victim did not stop, the defendant struck the victim on the top of the head, whereupon the victim hit him back. The defendant admitted that he lost control and fought with the victim, but ultimately, two or three people broke up the fight. The defendant was unaware of the victim's accusations against him until the Madison County sheriff's department came looking for his wife and daughters. The defendant later found out that the victim had reported her accusations of his sexual abuse to a neighbor the night of the fight. The defendant denied that he had touched either of his daughters in a sexual manner.

On cross-examination, the defendant stated that the victim is a "good-sized" girl. He also stated that he is 6 feet and $1\frac{1}{2}$ inches tall. He testified that the victim was drunk on the night of the fight, but he denied that he was drunk that evening, as he had had only six to eight beers. The defendant did not think it was right that his daugh-

ter was drinking when she was 13 or 14 years of age but believed that she should wait until she is 21.

William Thomas Porter testified that he is familiar with the St. Jacob/Marine Road as he drives an oil tanker for Quaker State Oil. He stated this road is travelled quite a bit during the day, but he did not think that the traffic would be too heavy at night. He testified that his daughter, Linda, and the victim are close friends, and he has known the defendant for 16 to 17 years. According to Porter, the defendant goes to work everyday, does not chase women, and has not caused any problems.

In rebuttal, the State called Theresa Oakley, the school counselor who visited the defendant's home regarding the victim. She first saw the victim in October 1986, and she talked to the victim four or six times before going to the victim's home. On her first visit, Oakley suspected sexual abuse, but she only gathered family history from the victim's mother. On her second visit to the home, she met with the defendant, his wife, and the victim. Oakley discussed the defendant's drinking problem, and the victim's feelings of depression. Oakley communicated to the defendant that he needed to seek treatment. The defendant said he would try to quit drinking, but he did not admit he was an alcoholic. Oakley found the defendant, his wife, and the victim very unresponsive, more so than on other occasions when she had visited other persons' homes.

Detective Rosalie Huebener testified that she is a deputy sheriff with the Madison County sheriff's department. She interviewed the defendant regarding the victim's allegations on August 15, 1988. Susan Redman was also present. When she asked the defendant why he took the victim on truck rides, initially the defendant did not answer the question directly, but finally the defendant told her that his wife wanted him to talk to the victim.

Detective Huebener stated that she also interviewed the victim. At the interview, the victim was "very tight," was "holding herself very close," was pale looking and seemed depressed. The victim did not give her details but said only that the defendant sexually abused her. The victim took Detective Huebener to the places where the defendant parked the truck when he molested her. On the night before she testified, Detective Huebener returned to these areas at 5:30 p.m., as she thought that would be a time when the roads were well travelled. She saw only two cars during the time she was out on these roads. Detective Huebener found that the areas to where the victim had taken her were concealed from the flow of traffic.

Following this testimony, the jury found the defendant guilty of two counts of criminal sexual assault, and the judge entered judgment on the verdicts. At the sentencing hearing, considerable testimony was presented by the defendant in mitigation. Numerous coemployees testified that the defendant was diligent, hard working and moral. They found the defendant's convictions for these offenses to be out of character to their knowledge of the defendant. The court sentenced the defendant to consecutive 15-year terms of imprisonment on each conviction. Subsequently, the defendant filed a post-trial motion, which was denied. A timely appeal followed.

The first issue raised by the defendant on appeal is that his due process rights were violated because the prosecutor allowed false testimony without correcting the testimony. The basis for the defendant's contention is that on the morning of the third day of trial, after the victim had testified, the prosecutor informed the court that the victim had made additional allegations the previous night to Andrea Stratman and Carolyn Warnecke. According to the prosecutor, the victim had told these witnesses that a second man, wearing a stocking mask and Halloween make-up, had participated with the defendant in the sexual molestation of her on several occasions. The defendant and his counsel took a recess to discuss this revelation, and upon returning, the court offered to recall the victim so that the defendant could cross-examine her on these new allegations. The defendant declined this offer. The defendant contends that because the victim did not tell the truth on the witness stand, his due process rights were violated.

The State contends that the defendant has waived this issue because the defendant declined to cross-examine the victim when the court offered him the opportunity to do so, the defendant did not raise this specific objection at the time of the prosecutor's advisement, and the defendant failed to raise this issue in his post-trial motion. We agree.

The general rule is that failure to raise an objection in a written post-trial motion waives that issue and it cannot be urged as a ground for reversal on review, even if it involves a constitutional right. (*People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261.) The only exceptions to the waiver rule are if the error is such that it would not normally be included in the post-trial motion, or if the reviewing court elects to take notice of plain errors affecting substantial rights. (*Friesland*, 109 Ill. 2d 369, 488 N.E.2d 261.) We do not find either of the exceptions to apply.

First, this issue is one which should have been included in a post-trial motion. Second, the plain-error-doctrine exception does not oper-

ate as a general saving clause, but generally operates where the evidence is closely balanced and the error is of such magnitude as to deny the accused a fair trial. (*Friesland*, 109 Ill. 2d 369, 488 N.E.2d 261.) Here, the evidence was not closely balanced. The victim's testimony of the defendant's actions was clear and convincing that she was sexually molested. The victim's testimony was also corroborated indirectly in that the victim's mother, the victim's sister and the defendant testified that the defendant took the victim on truck rides late at night. The fact that the victim was sexually abused was also corroborated indirectly by the testimony of the expert witness on rape-trauma syndrome and by Andrea Stratman, a victim herself of sexual abuse. Additionally, it cannot be said that the testimony given by the victim was false as presented to the jury, but only that additional information was excluded. Even if the new revelations were presented to the jury, at most the victim's credibility may have been weakened, but given the corroborating testimony, it would not have been destroyed, and at worst, the testimony may have shown that the defendant's actions were more reprehensible than presented. Further, the defendant was offered an opportunity to confront the victim about these new allegations, and he refused. Therefore, we decline to apply the plain error doctrine and find that the defendant waived this issue.

The defendant's second issue on appeal is that the court erred in denying disclosure of the victim's psychiatric records to his counsel. The defendant contends that this error was compounded by the new revelations made by the victim on the evening of the second night of the trial. The defendant argues that because of the possibility that the victim was hallucinating, the inaccessability of the victim's psychiatric records was more critical, and his ability to prepare for his cross-examination of the State's expert witness regarding the victim's mental health was hampered. The defendant also asserts that the court's *in camera* inspection of the documents was inadequate to protect his rights as the court did not review these documents from defendant's standpoint of the potential uses to which the information found therein may have been put, *i.e.*, to cross-examine, to consult independent experts, and to familiarize the defendant with the mental background of the State's sole witness against the defendant. We affirm the circuit court's ruling on this issue.

The law regarding this matter is that the evidence of a witness' mental condition is admissible to the extent it bears upon the credibility of the witness' testimony. (*People v. Monk* (1988), 174 Ill. App. 3d 528, 528 N.E.2d 1063.) Whether such confidential material is discoverable and subject to disclosure is a determination which rests

with the circuit court. (See *People v. Barkauskas* (1986), 147 Ill. App. 3d 360, 497 N.E.2d 1183.) In addition, a two-step procedure has been established for the courts to follow to determine if a witness' mental health records are subject to discovery. (*Monk*, 174 Ill. App. 3d 528, 528 N.E.2d 1063.) First, a defendant must sufficiently demonstrate that the requested records are material and relevant to the witness' credibility. (*Monk*, 174 Ill. App. 3d 528, 528 N.E.2d 1063.) If the defendant establishes the materiality and relevancy of the documents, and a witness or therapist asserts the statutory privilege of confidentiality, then the court should conduct an *in camera* inspection of the documents; however, the law does not provide that counsel has a right to be present at the court's *in camera* inspection but only that counsel's presence is allowed through the hearing on whether the documents are material and relevant and until a statutory privilege is asserted. *Monk*, 174 Ill. App. 3d 528, 528 N.E.2d 1063.

In the instant case, the defendant had initially sought the victim's psychiatric records in a motion for discovery. The records sought were from the victim's hospitalization in August 1988, after she had revealed the defendant's actions to Warnecke. The court, at the State's request, conducted an *in camera* inspection of the documents. After reviewing the victim's records, the court denied the defendant's motion for discovery of the victim's psychiatric records, finding that there was nothing exculpatory or useful for impeachment in these records. Subsequently, the defendant filed a second motion for discovery in which he again sought the victim's psychiatric records. This second motion was considered and denied by a different judge since this motion had been previously ruled upon by the first judge. However, during trial and after the disclosure of the victim's new allegations, the court reviewed the victim's psychiatric documents, and again the court determined there was no discoverable or exculpatory material in the documents. Thus, the court did not err in its handling of this matter, as it reviewed the documents *in camera*, an acceptable procedure, and the defendant's rights were adequately protected under the procedure used in this case.

Further, the defendant did not provide the victim's psychiatric records to this court, so a determination of whether the circuit court abused its discretion at trial is not possible. We also note that the defendant cross-examined the State's expert witness and the victim regarding the victim's hospitalization for psychiatric reasons, and that testimony revealed that the victim was hospitalized for suicidal ideations and for depression. The victim's testimony and the State's expert witness' testimony support the inference that these records

would not have been of impeachment value or exculpatory as the circuit court ruled.

The defendant's next contention is that the court abused its discretion in denying his request for a continuance during the trial following the disclosure of the victim's new allegations. The defendant contends that the denial of his motion prejudiced him in that he was deprived of an opportunity to investigate and reexamine the victim's credibility. The defendant asserts he needed the time to interview the witnesses to whom the victim made her posttestimony disclosures, to probe the details of the allegations, and to prepare his strategy in cross-examining the State's expert witness in light of the victim's new disclosures.

Whether to grant a continuance to permit further time to prepare a case depends upon the facts surrounding the request, and a decision to grant a continuance is left to the sound discretion of the circuit court. (*People v. Goodson* (1985), 131 Ill. App. 3d 734, 475 N.E.2d 1356.) Unless it appears that the denial of the request for a continuance has hampered the accused in the preparation of his defense and thereby prejudiced him, it cannot be said that the continuance was improperly denied. (*Goodson*, 131 Ill. App. 3d 734, 475 N.E.2d 1356.) Thus, absent an abuse of discretion, a circuit court's decision to grant or deny a continuance will not be overturned on review. (*People v. Wilson* (1988), 174 Ill. App. 3d 641, 529 N.E.2d 270.) Further, where a court has provided the defendant with an opportunity to investigate and impeach a witness' statement, it cannot be said that the court's refusal to grant a continuance was an abuse of discretion. (*Wilson*, 174 Ill. App. 3d 641, 529 N.E.2d 270.) We do not find that the court abused its discretion in denying the defendant's request for a continuance two days into trial.

■ Here, the defendant was offered an opportunity to recall the victim to cross-examine her about the new allegations, but the defendant elected not to pursue this matter. Therefore, because he was offered an opportunity to recall the victim and declined, we cannot say that the court's decision to deny the request for a continuance was an abuse of discretion. Further, following the victim's disclosures the court reviewed the victim's psychiatric records from the standpoint that the victim may have been hallucinating, and the court again determined there was nothing in the victim's psychiatric records to help the defendant in the preparation of his cross-examination, so it cannot be determined that the denial of the defendant's request for a continuance prejudiced him in the preparation of his defense. In addition, the corroborative testimony by the other State's witnesses of the vic-

tim's testimony was overwhelming, and the defendant had adequate notice of the State's evidence to prepare his defense. Thus, the court did not err in its denial of the defendant's request for a continuance.

The defendant's fourth issue is that the circuit court erred in allowing the expert-opinion testimony of Carol Corgiat. Specifically, the defendant asserts that Corgiat was not adequately qualified to testify as an expert witness, and that Corgiat was improperly allowed to testify to the ultimate conclusion that the victim was sexually molested. In support of his argument that Corgiat was not qualified to testify as an expert, the defendant directs our attention to the statute, which, at the time these offenses were committed, read that an expert must be a "behavioral psychologist, psychiatrist or physician." (Ill. Rev. Stat. 1987, ch. 38, par. 115—7.2.) However, the defendant acknowledges that this statute was subsequently amended to read "testimony by an expert, qualified by the court," instead of limiting the expert to those enumerated in the old statute, and it was the amended statute which was in effect at the time of the defendant's trial. (Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2.) With regard to the second portion of the defendant's argument, that the court erred in allowing Corgiat to testify to the ultimate conclusion that the victim was sexually molested, it is the defendant's position that the testimony of such an expert should be limited to whether the victim's behavior was consistent with the symptoms of rape-trauma syndrome.

The State argues that the defendant waived this issue because he only objected prior to trial to the State's failure to provide him with Corgiat's notes used by her in forming her opinion about the victim, a different objection from those he raises on appeal, and because the defendant failed to object to the testimony during trial and failed to raise this issue in his post-trial motion. We agree with the State. Failure to make the specific objection at trial which is raised on appeal waives the issue. (*People v. Harp* (1990), 193 Ill. App. 3d 838, 550 N.E.2d 1163.) Similarly, failure to object at trial and to raise the issue in a post-trial motion waives the issue on appeal. (*People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241.) Further, we note that the issue that Corgiat was not properly qualified under the statute is without merit. From our reading of the record, it appears that Corgiat was a psychologist who specialized in the area of sexual abuse. Whether she qualifies as a "behavioral psychologist" under the old statute cannot be determined from the record; however, this issue is resolved by the amendment of the statute, and the record reflects that Corgiat was ably qualified to testify as an expert in the field of rape-trauma syndrome both by her training and by her experience.

Additionally, the issue that Corgiat should not be allowed to testify to the ultimate conclusion of the victim's sexual molestation was addressed in *Harris*, and in that case, the supreme court determined such testimony was permitted.

■ The fifth issue raised by the defendant is that the prosecutor's cumulative misconduct throughout the trial prejudiced him and deprived him of a fair trial. The defendant asserts that the prosecutor's opening statement was improper, as the prosecutor suggested in his opening statement that the defendant was not being truthful, and that the prosecutor argued evidence not proved at trial. The defendant further contends that the prosecutor improperly inquired of two of the State's witnesses, Stratman and the victim's mother, as to the credibility of the victim, and that the prosecutor improperly cross-examined the defendant's witnesses on specific acts of misconduct, on matters that had no relation to the offenses charged, and on the witnesses' knowledge of the defendant's prior encounters with the law. The defendant takes issue with the prosecutor's use of rebuttal witnesses, contending that the State misused the rebuttal witnesses in that the State did not use the witnesses to rebut or impeach any of the defendant's testimony but instead introduced testimony that prejudiced the defendant. Lastly, the defendant contends that the prosecutor's closing argument was improper as it was inflammatory and prejudicial.

Again, the State has argued that the defendant has waived these issues as he did not object at trial and he failed to raise the objections in his post-trial motion. The defendant urges this court to consider this issue under the plain error doctrine. Without going into lengthy discussion, suffice it to say that we have reviewed the record and the defendant has waived the errors because he failed to object at trial and to raise the errors in his post-trial motion (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124); because his objections, where made, were sustained by the court, which cured any error (*People v. Glover-El* (1981), 102 Ill. App. 3d 535, 430 N.E.2d 147); or because he invited the prosecutor's statements or inquiries, thereby waiving the errors on that basis (*People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293). We do not find that the prosecutor's conduct either individually or cumulatively warrants our consideration under the plain error doctrine, as the errors, if any, were harmless. Additionally, the evidence against the defendant was overwhelming, and the alleged errors did not prejudice the defendant or deprive him of a fair trial.

Lastly, the respondent contends that his 15-year sentences of imprisonment on each conviction, to run consecutively, were improper and excessive as the defendant had no prior criminal history other than a driving under the influence conviction in 1985, the defendant had been free on bond without incident or violation since his initial arrest 15 months previous to his sentencing on the convictions, and the court failed to consider the evidence presented in mitigation. The defendant contends that the sentences imposed by the court did not adequately reflect the defendant's potential for rehabilitation and restoration to useful citizenship as required by law. Therefore, the defendant asserts the court abused its discretion in sentencing him to 30 years' imprisonment.

At sentencing, the State presented a presentencing investigative report and one rebuttal witness following the defendant's presentation of numerous witnesses in mitigation. The presentence report stated that the victim continues in therapy, and that in August 1988, she was hospitalized for 10 or 11 weeks for suicidal thoughts and depression. The victim takes antidepressants and antianxiety medication for her depression and for her fears. The victim suffers from fear of her father, suffers from her inability to sleep, and has flashbacks and nightmares. Her school work suffers from her inability to concentrate, and she receives inconsiderate remarks from her peers at school regarding herself and her father. The report indicated that the defendant's wife is torn between her husband, whom she still loves, and her concern for her daughter. The defendant's wife stated that her ultimate responsibility was to her daughters, but she believed that the defendant deserved probation, as she did not consider the defendant a threat to her or her daughter. In the presentence report, the defendant continued to deny that he had committed the acts of which he was convicted, and he believed his daughter has a mental problem. The presentence report reflected that the defendant had supported his family for 20 years, and that he continued to support the family financially after these charges were brought.

The defendant's wife testified in the defendant's behalf at his sentencing hearing. She reiterated her statements made in the presentence-hearing report. The defendant also presented numerous other witnesses. Some of the witnesses testified that the defendant was an intelligent, diligent, and hard-working individual, and that he would be able to retain his employment if he were granted probation. Other witnesses, who had known the defendant on a social basis, testified that they were unable to reconcile their knowledge of the defendant with the offenses for which he was convicted.

The defendant testified as to his ability to provide for his family financially. The defendant stated that he had not drunk alcohol for the past year. Further, the defendant admitted he would be willing to attend therapy sessions and would abide by any conditions imposed by the court should he be granted probation. On cross-examination, although the defendant was willing to attend counseling sessions, he did not see the use of such sessions since he did not commit the offenses for which he was convicted.

The State's rebuttal witness, Jane Heathcote, a child-welfare specialist for DCFS, testified that the victim would be provided counseling by DCFS even if the defendant were incarcerated and was unable to pay for her therapy.

A reviewing court's standard for review of a defendant's sentence is whether, in the exercise of its discretion, the court abused its discretion. (*People v. Cox* (1980), 82 Ill. 2d 2368, 412 N.E.2d 541.) In considering a sentence, a circuit court is to consider the seriousness of the offense and the objective of restoring the offender to useful citizenship, but the court is not required to give greater weight to the possibility of rehabilitation than to the seriousness of the offense. (*People v. Partin* (1987), 156 Ill. App. 3d 365, 509 N.E.2d 662.) In imposing the sentence, a court has no obligation to recite and give value to each fact presented at the sentencing hearing, and the court's sentencing decision is entitled to great deference and weight. (*Partin,* 156 Ill. App. 3d 365, 509 N.E.2d 662.) There is a strong presumption that the court's sentencing decision is based upon proper legal reasoning and that the court has considered any evidence in mitigation before it. *Partin,* 156 Ill. App. 3d 365, 509 N.E.2d 662.

■ In the case *sub judice,* the defendant was convicted of two offenses of criminal sexual assault upon his daughter, a Class 1 felony. Conviction of a Class 1 felony carries a sentence of imprisonment of not less than 4 years and not more than a 15-year term of imprisonment (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(4)), so the imposition of 15 years on each of the defendant's convictions was within the range permissible by statute. Further, a court can impose consecutive sentences where the court determines that such a term is required to protect the public from further criminal conduct by the defendant. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(b).) We do not find that the court abused its discretion in imposing the defendant's sentences in this case.

The court stated, in imposing its sentences, that it had considered the factors in mitigation and in aggravation presented at the sentencing hearing, the testimony produced at trial, the presentence report,

and the arguments of counsel. Therefore, the court considered that the defendant had no prior criminal record, that he had provided financially for his family, and that he had a good reputation in the community. However, the court also had before it the evidence that the defendant showed no remorse for his actions but continued to deny that he committed the offenses. Therefore, the defendant was not going to be rehabilitated through counseling if ordered to attend therapy as a condition of probation, as the defendant admitted at the sentencing hearing. The court also considered the evidence that the defendant had sexually molested his daughter between 30 and 50 times over a four- or five-year period, and that, if the daughter refused or fought the defendant in his molestation, the defendant used force upon his daughter to commit the acts. We find that the court's sentences reflected the seriousness of the defendant's offenses and affirm the court's sentences.

For the foregoing reasons, the judgment and sentences of the circuit court of Madison County are affirmed.

Affirmed.

HARRISON and HOWERTON, JJ., concur.