THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN H. ROLFE III, Defendant-Appellant.

Fifth District    No. 5—02—0760

Opinion filed October 5, 2004.

Daniel M. Kirwan and Michelle Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kim Koester, State's Attorney, of Newton (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

John H. Rolfe III, the defendant, was convicted by a Jasper County jury of one count of home invasion, three counts of attempted first-degree murder, and one count of aggravated battery. He was ultimately sentenced to serve 22 years' imprisonment for the home invasion conviction, 7 years' imprisonment each for two of the attempted first-degree murder convictions, 9 years' imprisonment for the third attempted first-degree murder conviction, and 30 months' probation for the aggravated battery conviction. The court found that it was mandatory that the sentences be served consecutively, under section 5—8—4(a)(i) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5—8—4(a)(i) (West 2002)). The court ordered the defendant to serve 85% of his sentence.

On appeal, the defendant asserts that the trial court erroneously ordered the sentences to be served consecutively, because "severe bodily injury" was inherent in the offenses as charged, and that, thus, the use of the infliction of severe bodily injury to impose consecutive sentences constituted an improper double enhancement of his sentence. He also claims that the trial court abused its discretion by giving a nonpattern jury instruction that improperly emphasized the State's theory of the case. He seeks the reversal of his conviction and a remand of the case to the circuit court for a retrial.

## BACKGROUND

The record on appeal, which is viewed in the light most favorable

to the prosecution in order to preserve the role of the jury as the weigher of the evidence (see *People v. Taylor*, 349 Ill. App. 3d 839, 844, 812 N.E.2d 759, 764 (2004)), discloses the following information.

On November 8, 2001, the defendant armed himself with a claw hammer and a knife and went in the early hours of the morning to the home of his mother-in-law, Robyn Spicer. He was motivated to do so because he correctly suspected that his estranged wife, Shana Rolfe, was having an affair with her coworker, Steve Stout. The defendant saw Stout's vehicle parked outside the darkened Spicer residence, surmised that Stout was inside the home with Rolfe, and entered the front door. Having gained entry to the darkened dwelling, the defendant stood in the kitchen with his back pressed against the wall in an attempt to conceal his presence from Spicer, who had risen to use the bathroom. Spicer noticed him, walked into the kitchen, and asked what he was doing in her house. The defendant retorted that Spicer knew what he was doing, and Spicer turned to retreat to her bedroom. As she walked into her bedroom, Spicer saw the defendant's arm rising behind her head, prompting her to put her hand up defensively to deflect the blow struck by the defendant. Spicer's memory of the events that immediately followed the initial blow was obliterated by her injuries, but she did recall regaining consciousness in her bloody bedroom, drenched in blood and in great pain. She was conscious on intake at the hospital and told the emergency room physician that she had sustained multiple hammer blows to the head, as well as blows to the hands and left forearm.

The record substantiates that Spicer had sustained a broken hand, with "two puncture wounds that looked like the claw marks of a hammer," and a large bruise on her palm, bruises to her left forearm, a large laceration on her forehead, and head injuries. She had a depressed skull fracture that was consistent with being struck with a rounded object like a hammerhead. It was so severe that bone fragments pressed into her brain and created a pneumocephalus, meaning that outside air entered the brain through the fracture. Spicer was airlifted to the Carle Clinic, where a part of her brain was removed and five steel plates and 18 screws were inserted in her skull to repair the damage caused by the defendant's attack. Spicer developed balance problems, expressive aphasia, pain, and increased fatigue, and she sustained permanent facial scarring as a result of the attack. She also has the potential to develop seizures in the future due to her brain injury.

After he attacked Spicer, the defendant entered the bedroom where Steve Stout and Shana Rolfe were sleeping, and he attacked the couple. The emergency room physician who treated Stout when he arrived at

the emergency room testified at the sentencing hearing that Stout was conscious when he was admitted and told the personnel that he had been attacked with a hammer and that he had been stabbed in the face. He sustained hammer and stab wounds that required his evacuation by airlift to the Carle Clinic. Once there, he endured surgery, an 8-day stay in the intensive care unit, and an additional 14 days in the rehabilitation unit. He had multiple facial bone fractures over his upper jaw that extended into his sinuses, a depressed skull fracture with bone fragments and air penetrating the brain, stab wounds to his face and hands, and a through-and-through stab wound in his upper left thigh. After surgery and physical therapy, Stout was left with multiple permanent scars, many of which were on his face, and he had memory loss and permanent damage to his leg, arm, and hand, which left him with a limp and the inability to write well with his dominant hand. Stout was no longer able to work in the restaurant industry as a result of his injuries, and he had no assurance that all his muscle tone would ever return.

Shana Rolfe woke to find the defendant in her bedroom yelling as he reached over her and struck Stout with a hammer. She fled the room and went to her mother's bedroom, where she found her mother lying on the floor, breathing oddly. Rolfe grabbed a portable telephone and ran out of the house to summon aid from the neighbors. The defendant caught up with her and attacked her with the hammer and his fists, striking the top of her head. The neighbor intervened when he got up to investigate who was screaming outside his bedroom window and saw the defendant beating Rolfe. He chased the defendant away from Rolfe, the defendant ran back into Spicer's home, and the neighbor returned to help Rolfe. The neighbor called the authorities, and Rolfe was transported to the hospital at the same time that her mother and Stout were taken there. The emergency room doctor testified at the sentencing hearing that Rolfe was able to tell hospital personnel that she had been struck with a hammer on her face, head, and right hand and that she possibly had been stabbed. The emergency room physician testified that the injuries to her lower jaw and cheekbones were consistent with being struck with a hammer or some other weapon and were inconsistent with being struck with a fist.

Rolfe was found to have multiple lacerations over her scalp, pain and swelling over her cheekbones and her entire lower jaw, and pain over her left forearm, wrist, and hand, as well as scattered areas of bruising and swelling over her right lower leg and right buttock. She sustained permanent damage to her right hand and her face. She had two hand surgeries, which resulted in the installation of a plate in her hand, held by five screws, and two maxillofacial surgeries to implant a

plate in her jaw, which had multiple fractures. The injuries to Rolfe's head resulted in permanent scarring, and she had lessened utility of her hand as a result of the injuries to her hand.

The doctor who performed triage on all three of the victims when they were brought to the hospital was of the opinion that all three victims sustained "great bodily harm," a term that he believed to be syronymous with "severe bodily injury." He assessed the injuries to Spicer and Stout as "life-threatening" depressed skull fractures and stressed that Rolfe's facial injuries resulted in marked disfigurement and a threat to her health.

The defendant returned to Spicer's home after his attack on Rolfe had been interrupted by the neighbor. Once there, he slashed his wrists and throat. He was later taken to the hospital for treatment.

The defendant's trial testimony was somewhat convoluted and was clearly intended to minimize the ferocity and severity of the attacks on the victims. He exhibited selective amnesia about various aspects of his assaults on his victims. He claimed not to even remember seeing Spicer and asserted that his attack on Stout was mutual combat during which he "probably" had the hammer in his possession. This claim was belied by his recorded statement to the police, in which he stated as follows: "I was beating Steve with a hammer that I'd grabbed from my car[,] mind you[,] like[,] two or three times [sic]. He got up out of bed. He was defending himself pretty good." The defendant maintained that he had pursued his terrified wife from the house because he "just wanted to converse with her" and that he struck Rolfe with his hand once or twice. He testified that he only intended to "scare the hell" out of his wife and Stout and that he had conceived the idea of going to his mother-in-law's house to place a knife between his unfaithful wife and her lover after seeing a "medieval" television show that depicted such a scene.

At the final instructions conference, the trial court informed the parties that it would give the State's instruction number 17, a nonpattern jury instruction on the law of intent, over defense counsel's renewed objection that it unduly emphasized the State's theory of the case and that a nonpattern instruction should not be given "on [a] crucial element of the case." During closing argument, the State argued that the defendant's intent to kill the victims could be inferred from the manner and circumstances of the attack, that his attack on Spicer had been prompted by her interruption of the defendant's planned attack on her daughter and her lover, and that defendant had "wanted a murder/suicide" but "his plan got messed up" and he failed to either murder his three victims or kill himself. Defense counsel responded by claiming that the defendant's lack of intent to

kill was evident because "if [he] wanted those people to be dead[,] they would be dead." This assertion echoed the defendant's opening statement, in which counsel told the jury that although the basic facts of the attack were not disputed, the jury would have to determine what the defendant's intentions were when he committed the attacks. Counsel stated that the jury was going to have to decide what the defendant's intentions were, "based on the type and nature of the injuries, [the] attendant circumstances of everything that happened[,] and the relationship of the parties." He implied that the defendant had not intended to kill the victims, stating that they had been "virtually helpless against the defendant's attacks" but noting that all of them were there to testify.

Following his June 13, 2002, convictions, the defendant filed various posttrial motions, which were denied at the July 26, 2002, sentencing hearing. The trial court found that the giving of the State's instruction number 17 was an appropriate exercise of its discretion, that even defense counsel conceded that it was an accurate statement of the law, that the instruction was short and simple, and that it was not argumentative. The State's instruction number 17 was given in order to fill a gap in the instructions to assist the jury in reaching a just resolution. In sentencing the defendant, the court found, *inter alia*, that consecutive sentences were required under section 5—8—4(a)(i) of the Unified Code (730 ILCS 5/5—8—4(a)(i) (West 2002)) and that section 5—8—4(b) of the Unified Code (730 ILCS 5/5—8—4(b) (West 2002)) also applied because the public needed to be protected from further criminal conduct. The defendant's August 23, 2002, motion to reduce his sentences was granted in part on November 8, 2002, and the instant appeal was pursued.

## CONTENTIONS ON APPEAL

On appeal, the defendant contends that the trial court imposed improper mandatory consecutive sentences, because bodily injury was inherent in the offenses of home invasion and attempted first-degree murder as charged, thereby creating a double enhancement of his punishment. He also asserts that the trial court erroneously allowed a nonpattern jury instruction on intent that unduly emphasized the State's theory of the case.

## DISCUSSION

### I. *Sentencing Issue*

■ The defendant was convicted of Class X crimes in which the infliction of severe bodily injury was an element and was then sentenced to serve consecutive terms under section 5—8—4(a)(i) of

the Unified Code, which authorizes consecutive sentences where the crimes were committed as a part of a single course of conduct, there was no substantial change in the nature of the criminal objective, one of the offenses for which he was convicted was a Class X felony, and the defendant inflicted severe bodily injury. He asserts that he was subjected to improper double enhancement, warranting the modification of his sentence by this court to make the terms of imprisonment run concurrently with one another.

The recent Illinois Supreme Court case of *People v. Phelps*, 211 Ill. 2d 1, 809 N.E.2d 1214 (2004), is dispositive of this issue. The *Phelps* court noted that double enhancement occurs when a single factor is used both as an element of an offense and as the basis for imposing a harsher sentence than would have otherwise been imposed. It went on to find that where a defendant is sentenced for Class X felonies that had as an element of the crimes the infliction of severe bodily injury, consecutive sentences may be imposed pursuant to section 5—8—4(a)(i) of the Unified Code. It found that "no double enhancement occurred because consecutive sentencing is not a sentencing enhancement"; rather, it " 'determines only the manner in which a defendant will serve his sentences for multiple offenses.' " *Phelps*, 211 Ill. 2d at 14, 809 N.E.2d at 1222, quoting *People v. Carney*, 196 Ill. 2d 518, 532, 752 N.E.2d 1137, 1145 (2001).

The imposition of consecutive sentences was appropriate under section 5—8—4(a)(i) of the Unified Code, and the defendant's sentence was clearly not the product of double enhancement.

## II. *Instruction*

■ The defendant contends that the court's giving of the State's jury instruction on intent was an abuse of discretion because the jury was already adequately informed of the law and the nonpattern instruction unduly stressed the State's theory of the case, that being that the defendant's attacks had been perpetrated with the express intent to kill the victims.

To prove the defendant guilty of attempted first-degree murder, the State must prove that the defendant performed an act constituting a substantial step toward the commission of the murder and that he possessed the specific intent to kill; a specific intent to kill may be shown by the surrounding circumstances, including the character of the assault and the use of a deadly weapon. *People v. Brown*, 341 Ill. App. 3d 774, 781, 793 N.E.2d 75, 80 (2003).

> "Because intent is a state of mind, it can rarely be proved by direct evidence. As a result, this court has recognized that where intent is not admitted by the defendant, it can be shown by surrounding

circumstances [citation], including the character of the assault and the nature and seriousness of the injury [citation].

In discussing the proof necessary to satisfy the intent element of attempt to commit murder, this court has further held:

' "Since every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act, it follows that if one wilfully does an act, the direct and natural tendency of which is to destroy another's life, the natural and irresistible conclusion, in the absence of qualifying facts, is that the destruction of such other person's life was intended." ' [Citation.]" *People v. Williams*, 165 Ill. 2d 51, 64, 649 N.E.2d 397, 403-04 (1995).

The law governing the giving of nonpattern jury instructions was succinctly set forth by the supreme court as follows in *People v. Pollock*, 202 Ill. 2d 189, 780 N.E.2d 669 (2002):

"A trial court may, *in the exercise of its discretion*, draft and give nonpattern instructions. [Citations.] The decision to instruct a jury using nonpattern instructions is reviewed for an abuse of discretion. [Citation.] Whether a court has abused its discretion will depend on whether the nonpattern instruction tendered is an accurate, simple, brief, impartial, and nonargumentative statement of the law. [Citations.] As a general rule, where an appropriate IPI instruction exists on a subject upon which the trial court has determined the jury should be instructed, the IPI must be used. [Citations.] Illinois pattern instructions were 'painstakingly drafted with the use of simple, brief[,] and unslanted language so as to clearly and concisely state the law,' and, for that reason, 'the use of additional instructions on a subject already covered by IPI would defeat the goal that all instructions be simple, brief, impartial[,] and free from argument.' [Citation.] Thus, while nonpattern instructions may be given, the instructions, as a whole, must not be misleading or confusing." (Emphasis added.) *Pollock*, 202 Ill. 2d at 211-12, 780 N.E.2d at 682.

The nonpattern instruction at issue was proffered by the State and ultimately given to the jury over the defendant's objections, although the defendant conceded that it was an accurate statement of the law. It offered a definition of proof of the intent to kill that read as follows:

"Intent to kill can be established by proof of surrounding circumstances[,] including the character of the assault, the use of a deadly weapon[,] and other matters from which an intent to kill may be inferred[,] and such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life."

As noted above, the defendant's opening statement to the jury emphasized that the jury was going to have to determine the defendant's intentions for the attacks, "based on the type and nature of the injuries, [the] attendant circumstances of everything that happened[,] and the relationship of the parties." That statement, while not as carefully crafted as the instruction, embodied the gist of the nonpattern instruction that was given to the jury. The instruction is a simple, straightforward, brief, impartial, and accurate statement of the law that fills in a gap in the instructions. Thus, its tender to the jury cannot be viewed as an abuse of the trial court's discretion.

We note in passing that the defendant's suggestion on appeal that the alleged prejudice resulting from the giving of the State's instruction number 17 would have been mitigated had the trial court given the jury a nonpattern instruction that emphasized his theory of the case—that the survival of the victims reflected that he did not intend to kill them—is meritless. Not only did he not proffer such an instruction to the trial court, but had he done so, the court would not have given it to the jury. His contention is reminiscent of the defendant's stance in *People v. Green*, 339 Ill. App. 3d 443, 791 N.E.2d 134 (2003), where the defendant argued that had he intended to kill the police officers at whom he had fired four or five shots from close range from a moving vehicle, he could easily have done so. The court observed that the facts supported the inference that the defendant's lack of competence with a pistol was just as likely a conclusion to draw from the facts and that "[p]oor marksmanship is not a defense to attempt (murder)." *Green*, 339 Ill. App. 3d at 452, 791 N.E.2d at 141; accord *People v. Johnson*, 331 Ill. App. 3d 239, 771 N.E.2d 477 (2002).

The shocking injuries and the ferocity with which the defendant inflicted those upon his victims were such that no sane adult would have engaged in such brutality or inflicted such injuries unless he intended to extinguish their lives. See *Williams*, 165 Ill. 2d at 65, 649 N.E.2d at 404 (an extraordinarily brutal attack on a toddler resulting in extensive head injuries was indicative of the intent to kill, regardless of the fact that the child's death was averted by heroic medical intervention). The fact that the objects of his rage and violence survived the defendant's attacks speaks to the wizardry of modern medical practice and the extraordinary dedication of their physicians, not to any intention on the part of the defendant to spare their lives.

1014

## CONCLUSION

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

Affirmed.

KUEHN and DONOVAN, JJ., concur.