2021 IL App (1st) 181482-U

No. 1-18-1482

Order filed June 4, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 5819 |
| | ) | |
| ANTHONY McMILLAN, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction for attempt murder where the evidence was sufficient for the jury to find that he intended to kill the victim.

¶ 2    Following a jury trial, defendant Anthony McMillan was convicted of attempt first degree murder (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 25 years' imprisonment. On appeal, defendant contends his conviction should be reversed because the State failed to prove beyond a reasonable doubt that he intended to kill the victim where he

inflicted a severe beating upon the victim but did not avail himself of "readily-available means and opportunities" to end the victim's life. We affirm.

¶ 3    Defendant was charged with one count of attempt first degree murder and two counts of aggravated battery of Walter Moore, stemming from events which occurred on a Chicago Transit Authority (CTA) train on March 1, 2013.

¶ 4    At trial, Moore testified that he was 51 years old and currently lived in a nursing home in Chicago for "about five months." He testified that prior to living at the nursing home, he had been living with his mother. He remembered he "got jumped on," five years prior to trial "on the El" but did not remember anything else about the incident. He next remembered being in the hospital. Moore testified that he had been using a wheelchair for "two, three months," and prior to that he was walking. He was occasionally able to use a walker but explained that walking "hurts [his] back." When he was living with his mother, he walked on his own and used the CTA as his primary form of transportation.

¶ 5    On cross-examination, Moore stated he was using the CTA to go to Northwestern Hospital at the time he was "jumped" because his "head hurt." He did not have a conversation with anyone on the train, but remembered having an altercation after a man hit him in his head, which was painful. Moore had not spit on the man before the altercation. After the man hit him, Moore "threw a punch" which missed. Moore did not remember having a conversation with the man.

¶ 6    The parties then stipulated that if called, James Higgins, a security manager for the CTA, would testify that, between February 28, 2013 and March 1, 2013, elevated train vehicle No. 5170 was operating on the CTA's Red Line between 95th Street and Howard Street. The train was equipped with six interior video security cameras, from which Higgins downloaded video images

from February 28, 2013 at 11:12 p.m. through March 1, 2013 at 12:42 a.m. The video images were transferred onto a digital media disk from CTA video operating equipment, and the video equipment was in proper working order at the time. The parties also stipulated that a proper chain of custody was maintained over the video segments, which the State referenced as People's Exhibit 1 and 2. The court admitted the exhibits into evidence.

¶ 7    The State published segments of the CTA video without narration. The published parts of the video show security footage of several angles of the same train car from the evening of February 28, 2013 through the early morning hours of March 1, 2013. The video shows a man, defendant, entering a train car at 11:13 p.m., rolling a red bag with a red pole sticking out from the top. Another man, Moore, wearing a baseball cap enters the train car from an adjoining car at 11:54 p.m. and sits down on the other end of the car from defendant. At 11:55 p.m., defendant approaches Moore and sits next to him and the men seem to engage in conversation. Moore stands up at 11:57 p.m. and walks down the train car to the other end of the train. Defendant follows him immediately and sits across from him. The men again seem to engage in a conversation. At 11:58 p.m. Moore stands up and walks back to his first seat at the other end of the train and sits. Defendant approaches him again at 12:00 a.m. and stands in front of him. Defendant passes Moore again at 12:01 a.m., tapping Moore's head as he passes him. Moore stands up and follows, pushing defendant, and they assume a fighting stance.

¶ 8    The men swing at each other while moving to the other end of the train. Moore swings first at 12:01 a.m. and they begin pushing one another against the door to the train car. Defendant takes Moore to the ground where they grapple. The view from this angle is partially obscured and defendant's back is to the camera. Defendant continues grappling and punching Moore on the

ground from 12:01 a.m. to 12:05 a.m. Moore attempts to stand up but falls back into defendant's arms. Defendant drags Moore by the armpits and punches him several more times on the ground, before kicking his head toward the front edge of the seats. At 12:06 a.m., defendant lays Moore prone on the ground and kicks him in the head twice, using the sole of his shoe in a stomping motion. Moore goes limp on the ground after the second stomp and remains motionless. After a few seconds, defendant stomps his head four more times. Defendant steps over Moore's body and stands by the train door for three to four seconds before returning to stand over Moore and stomp his head another three times. At 12:07 a.m., defendant sits down and looks in Moore's direction. Defendant puts on his hat and scarf and stands up again after approximately a minute and walks to Moore's body, stomping his head another six times. Defendant then walks away for another ten to fifteen seconds, before returning to stomp Moore's head another four times at 12:08 a.m. At 12:09 a.m., defendant exits the train with his red bag. Moore remains motionless and prone on the ground until the paramedics arrive at 12:40 a.m. The video shows that defendant stomped on Moore about the face and head a total of 19 times.

¶ 9      Chicago Fire Department paramedic Arlett Payne testified that she, along with her partner, Christian Mendoza, was dispatched to the 312 South State Street stop on the Red Line for an "unconscious victim." When they arrived, they saw Moore on the floor. They attempted to stimulate him to see if he was awake and attempted to communicate with him, but he did not respond to either attempt. They assessed his injuries, including determining whether he was breathing. They also performed the Glasgow coma test, to determine how alert and oriented he was. According to the results, Moore's score was "6" which meant "he fit the trauma criteria," so

they took him to Northwestern hospital, a trauma center. Moore had "a ton of lacerations and some hematomas," and did not speak to the paramedics.

¶ 10     The parties stipulated that, if called, Dr. Kenneth Pearlman would testify that on March 1, 2013, he was the attending emergency medicine physician in the emergency department at Northwestern Hospital. After examining Moore, Dr. Pearlman noted blood in Moore's airway, bruises on both sides of his forehead, an abrasion on the back of his skull, and a laceration near the left eye which was actively bleeding. Moore was able to move all four extremities and reacted to painful stimuli, but remained nonverbal during the initial examination. There was concern for intracranial bleeding, and CT scans were ordered, before the trauma team evaluated him. The trauma team noted his injuries seemed to be the result of blunt trauma. After further examination, Dr. Pearlman noted Moore had a laceration on the right side of his scalp. Moore had a Glasgow coma scale of "seven," which was indicative of a severe condition. The CT scan revealed "a small left parietal subdural hematoma which indicated blood between the brain and its outermost covering." Moore's face was swollen and one of his teeth had a fracture.

¶ 11     The parties further stipulated that if called, Dr. Steven Schwulst would testify that he was the attending trauma/emergency surgeon at Northwestern Memorial Hospital on March 17, 2013. On that date, Dr. Schwulst examined Moore and reviewed all pertinent laboratory results and radiological studies performed on him. Moore had an "acute extra-axial hematoma overlying the left front to temporal region and soft tissue standing overlying the right zygoma." Based on this information, Dr. Schwulst summarized Moore's condition as "having sustained a severe traumatic brain injury."

¶ 12    Lillie Smith, Moore's sister, testified that prior to March 2013, Moore was able to walk under his own power. She explained that prior to that date she saw him every weekend. The State showed Smith the CTA video, and she identified Moore in the footage.

¶ 13    On March 4, 2013, Smith met with detectives and visited her brother at the hospital. Smith explained that Moore was unconscious when she saw him, was breathing only with assistance, and was getting nourishment with a feeding tube. He was hospitalized for approximately four months, after which he went to Northwestern Rehab Center for six to eight weeks. After that, he was a patient at a nursing home for approximately a year and a half. Smith visited him there and testified that he began "to say a couple words" to her at the nursing home, but was not eating on his own. In February 2014, Smith transferred him to Palos Hills Nursing Home, and sees him "[v]ery often."

¶ 14    In fall of 2015, Moore began eating on his own again, but was unable to walk under his own strength and used a wheelchair. In April 2018, at the time of the trial, Moore was able to walk but "loses balance" when he attempts to walk without the aid of a wheelchair or walker. Moore could not cook for himself, but was able to feed himself. He wore adult diapers every day and did not need to do so prior to March 2013. Smith identified photographs which she had taken when Moore was in the hospital. She identified bruising on Moore's forehead as well as "the swelling and indentation" across his head.

¶ 15    On cross-examination, Smith stated that Moore was on the train because he was "on his way to Northwestern Hospital" because he did not feel well. Smith explained that he has "started to improve," in comparison to his condition when she first saw him at the hospital.

¶ 16    Chicago police officer Luis Novalez testified that on March 2, 2013, he and his partner were assigned to "a foot post over at Chicago and State" searching for a man who committed an

aggravated battery on the CTA. At approximately 8:15 p.m., Novalez and his partner saw a man who matched the suspect from a photograph from the CTA bulletin they were using as a reference. Novalez approached the man, who, without being asked, stated "if it's about the fight on the train, he hit me first." Novalez identified this man in court as defendant. Novalez and his partner took defendant into custody and transported him to the police station.

¶ 17    At the station, Novalez inventoried the clothing defendant was wearing according to the Chicago police department inventory procedures. He identified a scarf, hat, and gloves which he had inventoried. Defendant's "overalls" were also inventoried in Novalez's presence. Novalez also identified the CTA bulletin which he used to identify defendant.

¶ 18    Chicago police officer Terrance McKitterick testified that he was an evidence technician and took photographs of defendant at the police station on March 2, 2013. McKitterick photographed defendant's body, clothes, and belongings. He identified the photographs he took of defendant on March 2, 2013, and testified that the photographs truly and accurately depicted how defendant looked at that time. McKitterick also identified a "photo ID" of defendant which included frontal and side profiles of defendant's face, as well as photographs of defendant's hands, boots, and pants. The purpose of photographing defendant's pants was "[t]o document and preserve the red substance, suspect blood, which was on the right leg of the pants."

¶ 19    On cross-examination, McKitterick stated that he did not notice swelling on defendant's hands.

¶ 20    The parties stipulated that if called, Lynette Wilson, a forensic scientist, would testify that she conducted a Polymerase Chain Reaction DNA analysis on evidence submitted, including a

buccal standard collected from Moore and the stain from defendant's overalls. The DNA profile identified from the stain matched Moore's DNA profile.

¶ 21    Defendant testified that at the time of the incident he lived with his mother and worked as the owner of a window washing service. He explained that his window washing equipment is visible in the video as "a red pole and a bucket." On March 1, 2013, he had visited his mother at Northwestern Hospital earlier in the evening. He was going home by using the Red Line, after stopping at the store to purchase half a pint of gin and grapefruit juice. He saw Moore, whom he had never seen before, come on the train and walk to the other end of the car. Defendant "got up and went to talk to [Moore]" because Moore resembled a person that he knew. Defendant told Moore about his mother who was in the hospital, to which Moore replied "[f]*** you. F*** your mother. I don't care if the b**** dies" and got up and walked the other way after spitting in defendant's direction. Defendant then got up and tried "to reason with him first" because it "hurt" him very much that Moore would say that to him. Moore was "talking really bad" toward defendant before walking to the other end of the car.

¶ 22    Defendant followed Moore and sat with him again and "considered making [himself] a pest to him," before standing up and touching Moore on his head and walking to the other end of the car. Moore then "jumped up," and they both "got into the fighting stance." Moore threw the first punch and hit defendant on the right cheek. The fight then escalated, and defendant did not try to count the number of times he hit Moore. Defendant did not want or intend to kill Moore, who was still talking and swearing at defendant when they were both laying on the ground. Defendant testified that he was not aware that he had stomped on Moore until he saw the video, but then stated he knew he "had stomped him" but was very upset and did not realize how extensively he

had done so. He never tried to strangle Moore, step on his neck to kill him or "use [his window cleaning tools] as a weapon to try and kill him."

¶ 23    On cross-examination, defendant stated he meant to hurt Moore very badly but did not intend to kill him. Before he watched the video, defendant only remembered stomping on Moore's head "[w]ithin the range of two to six" times. He agreed that the video showed him stomping on Moore's head and face 19 times, but defendant was unaware of "the last 13 stomps" until he watched the video. The State then showed defendant the video, and questioned him about the events contained therein, including the length of time he was on the train. Defendant indicated Moore spat in his direction as he walked past him and away from the direction of the camera. Defendant approached Moore and engaged him in conversation twice more after Moore spat in his direction. Defendant then tapped Moore on the head and explained that this was the first "intentional touching" between the men.

¶ 24    Defendant described the fighting in depth, narrating the events in the video. He stated he was worried Moore was reaching "for something" and grabbed him when he tried to get up. He described the altercation as a fight, and indicated he was only kicking Moore, not trying to kill him. Defendant stomped on Moore a number of times, which he did not count, in the chest and "in the face cavity." Moore continued to tell defendant "f*** you" and "talk[ed] really bad" to him so defendant stomped him three or four more times. Defendant said Moore was laughing at him. After sitting down for a minute, defendant stood up, approached Moore, and stomped him four more times because "that happens in a fight," but did not mean that he was attempting to kill Moore. He stated that if he "wanted to kill Mr. Moore, then he would have been dead." After these last four stomps, Moore was still laughing at him so defendant stomped on him five more times because

Moore "made [him] mad." He affirmed that he did not intend to kill Moore. He explained that at the time he was wearing rubber boots, "not like hard toe or steel toe boots." At the police station, defendant spoke with an assistant state's attorney (ASA) and told the ASA that Moore said "derogatory things" to him and spat "in [his] direction," but did not say Moore spat "on him."

¶ 25    In rebuttal, ASA Enrique Abraham testified that he was employed by the Cook County State's Attorney's Office and interviewed defendant on March 3, 2013. After reading defendant his *Miranda* rights, Abraham spoke with defendant, who never told him that Moore said "f*** you to him and f*** your mother and I hope that b**** dies." Abraham had a second interview with defendant, and defendant did not tell him that the victim said anything about his mother but did inform Abraham that the victim spat "on him."

¶ 26    On cross-examination, Abraham stated that in none of the interviews he had with defendant did defendant ever say he intended to kill Moore. Abraham acknowledged that he did not record either interview he had with defendant or ask him to make a written statement.

¶ 27    In closing, defendant argued that it was "cut and dry" that he had committed aggravated battery upon Moore, but he did not intend to kill him. He argued that instead of "kicking" him, he could have stepped on his throat or strangled him with his hands. The State argued that after the first two kicks to the head, Moore was unconscious and vulnerable, and defendant kicked him in the head another 17 times. The State pointed out that there were pauses in between the stomps during which defendant "had decisions to make."

¶ 28    After deliberations, the jury found defendant guilty of attempt first-degree murder and the two counts of aggravated battery. The court denied defendant's subsequent motion for a new trial,

merged the aggravated battery counts into the attempt murder count, and sentenced him to 25 years' imprisonment.

¶ 29    On appeal, defendant challenges the sufficiency of the evidence to sustain his conviction, arguing the State failed to prove beyond a reasonable doubt that he intended to kill Moore. Specifically, he argues that although the evidence showed that he inflicted a severe beating upon Moore, he did not "avail himself of readily-available means and opportunities to end Moore's life," including choking him, breaking his neck, or using his container of window washing tools as a means to "bludgeon Moore or cut his throat." He requests that we reverse his conviction for attempt murder and remand the cause for resentencing as to his aggravated battery convictions.

¶ 30    The standard of review for challenging the sufficiency of the evidence to sustain a conviction is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The standard of review is applicable regardless of whether the evidence is direct or circumstantial, and regardless of whether the defendant receives a bench or jury trial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (citing *People v. Cooper*, 194 Ill. 2d 419, 431 (2000)). The trier of fact, in this case the jury, is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a

reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). For the following reasons, we find the evidence sufficient to support defendant's conviction.

¶ 31     To sustain defendant's conviction for attempt first degree murder as charged in this case, the State had to prove beyond a reasonable doubt that: "(1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) defendant possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52; 720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012). In this court, defendant only challenges the intent element of attempt first-degree murder.

¶ 32     Attempt murder is a specific intent crime, so the State must prove the defendant had the specific intent to kill. *Viramontes*, 2017 IL App (1st) 142085, ¶ 52. "A person intends, or acts intentionally with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2012). Because intent is a state of mind, it is rarely able to be proven by direct evidence. *People v. Williams,* 165 Ill. 2d 51, 64 (1995). Accordingly, a defendant's intent to kill may be inferred from the surrounding circumstances, including the character of the attack, the use of a deadly weapon, and the nature and extent of the injuries inflicted. *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 34. Further, intent to kill may be inferred when a defendant willingly commits actions with the natural tendency to destroy another's life. *People v. Smith*, 402 Ill. App. 3d 538, 547 (2010) (citing *People v. Koshiol*, 45 Ill. 2d 573, 578 (1970) (overruled on different grounds by *People v. Nunn*, 55 Ill. 2d 344 (1973))). "Once the elements of attempt are complete, abandonment of the criminal purpose is no defense." *People v. Winters*, 151 Ill. App. 3d 402, 406 (1986); see also *People v. Maxwell*, 130 Ill. App. 3d 212, 217

(1985) ("The fact that an assailant * * * chooses to flee * * * rather than choosing to inflict a fatal injury, does not negate the existence of the intent to kill"). The question of a defendant's intent to kill is one of fact to be determined by the trier of fact. *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004).

¶ 33    Viewing the evidence in a light most favorable to the State, and allowing all reasonable inferences drawn in favor of the State, we find a rational trier of fact could conclude beyond a reasonable doubt that defendant intended to kill Moore. The State presented video evidence showing that defendant and Moore engaged in a fight on the CTA's Red Line. During the fight, defendant rendered Moore motionless by kicking him in the head twice. Over the course of the next several minutes, defendant repeatedly returned to Moore, who lay motionless on the ground, and stomped on his head and face area a total of 17 more times. After rendering Moore motionless, defendant took a break for a few seconds and then returned to Moore and stomped on his head four more times. Defendant took another break and stomped on Moore's head another three times. Defendant then sat down, put on his hat and scarf and, after approximately a minute, stomped on Moore's head another six times. Defendant walked away for another ten to fifteen seconds, before returning to stomp on Moore's head another four times. Defendant then left the train. See, *e.g.*, *People v. Scott*, 271 Ill. App. 3d 307 (1994) (affirming attempt murder conviction where the defendant used his fists "extensively" to beat the victim and left her severely beaten and bloody body lying on the ground in a store).

¶ 34    As a result of defendant's actions, Moore suffered "a traumatic brain injury" and was unable to breathe or feed himself without assistance. He was hospitalized for four months followed by an additional six to eight weeks at a rehabilitation center. He was then placed in the care of two

different nursing homes and, at the time of trial, wore adult diapers daily and was unable to walk unassisted. Smith, Moore's sister, described him as "start[ing] to improve" at the time of trial, five years after the altercation. See *Viramontes*, 2017 IL App (1st) 142085, ¶ 62 (finding the facts sufficient to permit a jury to conclude the defendant intended to kill the victims, who both suffered severe traumatic brain injuries from his attack); see also *Scott*, 271 Ill. App. 3d at 310 (the victim was hospitalized for 22 days, suffered post-traumatic amnesia, required surgery, and suffered from ataxia, or problems with her balance, as a result of the head trauma); *People v. Rolfe*, 353 Ill App. 3d 1005 (2004) (finding intent to kill where defendant's attack left the victims with *inter alia*, depressed skull fractures, permanent damage to various body parts including hands and faces, memory loss, balance problems, and the potential to develop seizures in the future). This evidence was sufficient for the trier of fact to conclude that defendant intended to kill Moore and sustain his conviction for attempt first degree murder.

¶ 35    Defendant nevertheless argues the State did not present sufficient evidence that he intended to kill Moore. He argues that while his assault on Moore was "sustained and brutal," he did not avail himself of a clear opportunity to kill him, including not using his window washing tools as weapons to do so. In support of this argument, he cites to *People v. Thomas*, 127 Ill. App. 2d 444 (1970), *People v. Jones*, 184 Ill. App. 3d 412 (1989), and *People v. Garrett*, 216 Ill. App. 3d 348 (1991). We find these cases distinguishable from the facts presented here.

¶ 36    In each of the cited cases, the defendants were armed with a deadly weapon and had the opportunity to commit murder, but did not use the weapon in a manner showing that they had the intent to kill. Here, unlike in *Thomas*, *Jones*, or *Garrett*, defendant was not armed with a deadly weapon, despite his attempts on appeal to characterize his "window washing equipment" as such.

Accordingly, unlike in *Thomas*, *Jones*, or *Garrett*, defendant did not show restraint in using a weapon. Rather, in this case, defendant, as mentioned, rendered the victim motionless by kicking him in the head twice and then continued to stomp on his head another 17 times while taking breaks between the stomps. As mentioned, this court will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Jackson*, 232 Ill. 2d 246, 281 (2009). This is not one of those cases.

¶ 37    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 38    Affirmed.